## Case No. 5,166.

The F. W. GIFFORD.

[7 Biss. 249;[1] 9 Cni. Leg. News, 9.]

District Court, E. D. Wisconsin. Aug., 1876.

[1] [Reported by Josiah H. Bissell, Esq., and here reprinted by permission.]

Wm. P. Lynde, for libellants.
H. H. Markham, for claimants.

DYER, District Judge. Upon some of the material questions of fact, there is no dispute. The collision occurred in daylight, between six and seven o'clock in the morning, and when the weather was clear. The wind was from the northwest, blowing a fresh breeze, and causing considerable sea. The Aetna was sailing close hauled on the starboard tack, at a speed of four or four and a half miles an hour, on a west-southwest course, under a single reefed mainsail, full foresail and three jibs. The Gifford was sailing on the port tack, close hauled at a speed of about five miles an hour, heading north-northeast, and carrying double-reefed mizzen sail, whole-mainsail, foresail, staysail and jib. The captain of the Gifford testifies that when he first discovered the Aetna, she was three or four miles away, and from a point and a half to two points on the starboard bow of the Gifford. The captain of the Aetna says that when he sighted the Gifford, she was from four to five miles distant, and from three to four points on the port bow of the Aetna. It seems not to be disputed that each vessel could be seen from three to five miles away, and that they were continually in sight of each other, from the moment when first observed until the collision.

[2] [Concerning circumstances transpiring just before the collision, and the respective movements of the two vessels as they approached each other, there is disagreement. The master of the Gifford testifies that the vessels stood on their courses until they were about three-quarters of a mile apart, when he ordered the man at the wheel to give her a good full, preparatory to going about; that when he thought his vessel had way, he ordered the wheel put down slow, having first directed the men forward to get ready for stays; that the wheel was put down, the jib-sheets were let go, and the vessel came up into the wind, but did not swing around; that

---

[2] [From 9 Chi. Leg. News, 9.]

he thereupon ran aft and ported the helm; that he also called the mate from below, a collision being then imminent, and the mate immediately let go the fore sheet, when the Gifford having thus missed stays, the vessels struck. He says when he attempted to stay the Gifford, she was from one-half to three-quarters of a mile from the Aetna; that at the time of the collision, he thinks the Aetna was on her course, heading west southwest; that the effect of the collision was to swing the Gifford round so that she then stood on her starboard tack; that at the time the Gifford missed stays, and when the collision occurred, she stood head to the wind, with both jib sheets and the fore sheets gone, and the fore-boom half way out to the fore rigging, and the foresail with it. That he attempted to stay his vessel because he thought that, having room, and never having had trouble in staying her before, she would go around; that she did not fill away again after missing stays at the time of the collision; that the collision could have been averted by porting the helm of the Aetna and putting her in stays, but that no such movement was executed; that she was heading across the bows of the Gifford when they struck, and that, at the time of the collision, the Gifford had no headway. Corroborative of this testimony of the master, in various particulars, is that of the mate, wheelsman, and one seaman.

[The master of the Aetna testifies, that his vessel was kept on her course until a collision being imminent, he ordered her put in stays, but that before she got around the Gifford struck her; that he saw the jibs of the Gifford shaking when at some distance away, but could not tell what maneuver she was executing; that from appearances she might be in the wind, or might be lighting up her sheets; that he could not see that she was in a helpless condition, and that he supposed she was getting away from the Aetna's course; that her jib-boom struck the Aetna's foresail, carrying away her main rigging, breaking her rail and stanchions, springing the main mast head and inflicting other injuries. The witness, Charles Miller, seaman, was on the deck of the Aetna before and at the time the collision occurred, and testifies that it was thought by those on board the Aetna that the Gifford would tack and pass clear of the former's course; that, as the danger of collision increased, the wheel of the Aetna was put hard down, and the head sheets were eased up; that he saw the Gifford's jibs shaking in the wind, and that she filled away again, and at the time of the collision he thinks she had some headway. Henry Lang, mate of the Aetna testifies, that he saw the Gifford lighten her head sails, but could not tell whether she was going about or what she was doing, and that when he first saw the Gifford she had plenty of time to get out of the way. In a few moments he saw her head sheets hauled aft, and he says she filled away again. He testi-

fies that he saw the Gifford coming toward the Aetna, when the captain of the Aetna ordered her wheel hard down, and the witness went forward and let go the head sheets, and as this was being accomplished, to put the Aetna about, the vessels struck. This witness says further, that when the wheel of the Aetna was put hard down, she answered her helm directly, and was coming up into the wind when the Gifford struck her.] [2]

It is plain that a collision thus occurring in open sea and in broad daylight, between two vessels easily seen miles apart, and whose courses, on the tacks upon which they were sailing, necessarily intersected each other, cannot be attributed to unavoidable accident. It is equally clear that the case is one where the 17th rule of the navigation act is applicable; that, "when two sail vessels are crossing so as to involve risk of collision, then, if they have the wind on different sides, the vessel with the wind on the port side, shall keep out of the way of the vessel with the wind on the starboard side," neither vessel being free, but both being close hauled.

This rule has been not only frequently, but rigidly enforced by the courts. The Friends, 1 W. Rob. Adm. 483; The Chester, 3 Hagg. Adm. 316; The Woodrop-Sims, 2 Dod. 86; The Thames, 5 C. Rob. Adm. 345; The Celt. 3 Hagg. Adm. 327; The Jupiter, Id. 320; Allen v. Mackey [Case No. 228].

In the case of St. John v. Paine, 10 How. [51 U. S.] 579, Nelson, J., in his opinion, says: "The vessel on the starboard tack has a right to keep her course, and the one on the larboard tack must give way, or be answerable for the consequences. * * * When vessels are crossing each other in opposite directions, and there is the least doubt of their going clear, the vessel on the starboard tack should persevere in her course, while that on the larboard tack should bear up or keep away before the wind. * * * No one can look through the reports in admiralty in England, without being struck with the steadiness and rigor with which these general nautical rules have been enforced in cases of collision, under the advice of the trinity masters of that court, or fail to be impressed with the justice and propriety of such application, and the salutary results flowing from it."

In the case of The Kingston-by-Sea, 3 W. Rob. Adm. 153, it was an established fact that the two vessels had ample time to see each other at the distance of two or three miles, and had abundant opportunity to take measures to avoid a collision. The Kingston-by-Sea attempted to go in stays but missed, and the trinity masters held, first, that she had it in her power to choose the distance at which she would tack, and, secondly, if a vessel is put in stays and misses, it is the duty of those on board to so navigate the vessel as to let her pay off.

In the case of The Ann and Mary, 2 W.

[2] [From 9 Chi. Leg. News, 9.]

Rob. Adm. 189, the rule was declared as one to be strictly adhered to, that the vessel on the starboard tack must put her helm aport to keep the wind, and the vessel on the larboard tack must do the same to bear away; and the vessel proceeded against was adjudged in fault because she put her helm alee and did not bear away. See, also, The Traveller, Id. 198; Holt, Rule of Road, 92, 100, 114; Bently v. Coyne, 4 Wall. [71 U. S.] 509.

That part of the rule, that a close hauled vessel on the port tack, must give way to one sailing by the wind on the starboard tack, close hauled, is not more imperative than is the further branch of the same rule, as enforced by the courts, that the latter vessel must keep her course. In the case of The Richard R. Higgins [Case No. 11,768], it was held that to relieve a vessel from fault in changing her course when the rule required her to keep it, she must show clearly that it was done after a collision had become inevitable, or at least, after a courageous and skilful navigator would have thought it so.

Justice Clifford in the case of Bently v. Coyne, before cited, says: "Persons engaged in navigating vessels upon navigable waters are bound to observe the nautical rules recognized by law in the management of their vessels, on approaching a point where there is danger of collision. Undoubtedly the same law which requires vessels having the wind free, or sailing on the larboard tack, to keep out of the way or give way, as the case may be, also imposes the correlative duty upon those close hauled on the wind, or sailing on the starboard tack, to keep their course, in order that the former may know the position of the object to be avoided, and not be baffled or led into error in their endeavors to comply with the requirement." See, also, New York & L. Steamship Co. v. Rumball, 21 How. [62 U. S.] 372.

Both vessels, in the present case, were in the precise position requiring compliance with the rule. There was devolved upon the Aetna the general duty to pursue her course, so that the Gifford might not be misled or baffled in her movements, and the duty imposed upon the Gifford was to keep out of the way of the Aetna. The burden was upon her of avoiding the danger of collision. The captain of the Gifford testifies that he sighted the Aetna when four or five miles away. The wind was fresh, causing about a six or eight-foot sea. Under these circumstances there can be no doubt that there was ample time and room for the Gifford to bear away under a port helm, and to have passed astern of the Aetna; and this is precisely the movement which the court in St. John v. Paine, supra, says should be executed under such circumstances. But the master of the Gifford took the responsibility to execute a different maneuver, which was to continue on his course until, as he says, his vessel was three-quarters of a mile from

the Aetna, when he attempted to put her in stays, which she missed.

Upon the positive testimony in the case, my conclusion is, that the Aetna kept her course until a collision became inevitable. It is urged that the Gifford was three-quarters of a mile off when she attempted to go in stays and stood in the wind, and that there was a space of 1185 feet between the Gifford's bows while in the wind and the direct course of the Aetna at that distance; from which the conclusion is deduced that the Aetna must have fallen off from her original course. But this theory rests strongly upon conjecture and is against the positive testimony on both sides, and is, I think against the circumstances. The captain of the Gifford as positively testifies that the Aetna kept her course as does any witness for libellants. Then it cannot be assumed as a certainty that the Gifford was three-quarters of a mile from the Aetna when she attempted to go in stays. Capt. Berryman states the distance as one-half to three-quarters of a mile. One of libellants' witnesses also testifies that the effort to go in stays was made from seven to nine minutes before the collision, and that the jib-boom of the Aetna was then pointed to the fore-rigging of the Gifford, which would certainly bring the latter vessel very near to the Aetna's course. It is clear that the Gifford was nearer to the point where the courses of the two vessels intersected, than was the Aetna, when the effort was made to stay the Gifford. The evidence is that she would forge ahead some distance under a slackening headway, after her wheel was put hard down, and adding to that, the possibility of her filling away again, a point disputed by the witnesses, I am constrained to believe, that at the time and point where the attempt was made to stay the Gifford; the proximity of the two vessels made that maneuver hazardous. The captain of the Gifford says, that at the point where his vessel stood, there was room to get out of the way if she did not miss stays; but that there was not room to do so if she missed, which tends strongly to show that the movement was not made at sufficient distance. It is exceedingly difficult upon all the testimony and in view of the ample time, space and opportunity which the Gifford had for taking a course that should be entirely safe for both vessels, to resist the conclusion that she was in fault in the movement she did make. She had it in her power to determine at what distance she would attempt to go about, upon choosing that as the maneuver for avoiding the Aetna. The burden was cast upon her by the law of the sea, of keeping out of the way, and when, with the time and room she had for adopting a course which would beyond question avoid not only a collision but all danger, it must be held that when she chose another course attended with hazard, she did so at her peril. It is true that the captain of the

Gifford had not before had any difficulty in staying his vessel, but he says he never before attempted to stay her in such a sea. He may have exercised what he thought at the time was proper judgment, but his judgment proved erroneous, because his vessel missed in the attempted movement.

The testimony on the part of the claimants is to the effect that the Gifford was head to wind, with shivered canvass at the time of the collision; and upon the point of proximity to the Aetna, it should be noted that the captain of the Gifford says she was in the wind four or five minutes or more, and when in that position was too near the Aetna then to try to stay her. Moreover, the spirit of the rule laid down by the trinity masters in The Kingston-by-Sea, is, that when a vessel misses stays under such circumstances, efforts should be made to let her pay off instead of standing steadily in the wind.

It is true that experienced seamen have testified that the movements of the Gifford, as they are given by her master, were proper, though most of them speak cautiously, and make the case depend on circumstances. It is evident that their approval of going in stays in such cases, rests largely upon the fact that time and distance are saved, which are considerations certainly not to be weighed against safety.

One of these witnesses is so clear in his view, that the suitable course is to go in stays, that he gives it as his understanding of the rule of the navigation act, that when two vessels are meeting on opposite tacks, close hauled, to avoid collision, it requires the vessel bound to give way, to put the helm down and go in stays, when, in fact, the rule says nothing about such a movement; and the diagram issued by the bureau of navigation, illustrative of the rule, shows that the port tack gives way to the close hauled starboard tack by porting. The captain of the Gifford gives as one of his reasons for going in stays, the fact that he would have lost time and distance if he kept his vessel off, a reason which cannot receive approval. Since it would have been entirely a safe and successful movement, in the time and space which the Gifford had, to have ported her helm and gone to the leeward of the Aetna, passing her stern, it seems clear that this should have been done. As some of the witnesses say, this movement would probably have carried her to some extent into the troughs of the sea; but the danger to the Gifford in this respect would have been less than the other course proved to be to both vessels.

The remarks of the court in Allen v. Mackey [Case No. 228], are applicable. The Gifford should have gone under the stern of the Aetna, "because by doing so the vessels would be constantly increasing their distance from each other, and because this course would not require on her part any calculation of the rate of speed at which the

other vessel was going." The circumstance that, after the Gifford came up in the wind and did not go around, the captain then put the helm to port, is indicative of an attempt then useless, to do that which if done in proper season, would have avoided the collision.

But it is contended that the Aetna brought the injury upon herself, and that the collision was not averted because of her own recklessness. She stood on her course. In doing this, she was complying with the rule and with the principle laid down by the courts with so much emphasis, that when there is the least doubt of vessels on opposite tacks going clear, the vessel on the starboard tack should persevere in her course. The Aetna had the right to proceed upon the presumption that the Gifford would give way and was in the act of doing so. Under the rules laid down in the decisions, her duty was to keep her course until a collision was impending; otherwise, the movements of the other vessel might be baffled. It is said that the Gifford was disabled, that her sails were shaking in the wind, and that her condition of alleged helplessness must have been apparent to those on board the Aetna. But I am not convinced that her disability was so great, when first she missed stays, as to render her entirely helpless. And, moreover, the fact that she stood in the wind, and that her foresails were shaking, would not be a conclusive indication to those on board the Aetna that the Gifford had missed stays. Captain Norris testifies that if he had been on the Aetna, he could not have concluded, upon seeing her head sails lifting, that the Gifford had missed stays, until he should see her fall off and fill away. Other witnesses on both sides substantially concur with him. Upon all the testimony I regard it as reasonable that those on board the Aetna would, from natural observation, judge that the Gifford was endeavoring to give way, and would give way. An extremity was soon disclosed that forbade the Aetna from standing further on her course, and that brought her within the principle of the 24th rule. Special circumstances were presented which made it necessary to depart from the rule of adhering to her course, and which involved "due regard to the dangers of navigation." And I think the testimony and the circumstances establish that when peril was impending, measures were taken to put the Aetna about. Of course the Aetna had not the right to persist in her course so as to run the Gifford down. If it became the duty of the master of the Aetna to take measures to keep out of the way of the Gifford, the question is, when did that duty begin. Following the reasoning of Judge Longyear in the case of The H. P. Baldwin [Case No. 6,812], it will not do to say that it began when it became probable that the Gifford would not get out of the way, because by article 17 it was the duty of the Aetna to keep her

course, and it would not do for her to change it so long as there was any room for doubt as to the intentions of the Gifford.

At what point did the duty arise requiring the Aetna to take steps to avoid a collision? She was where the law says she should be under such circumstances. Adopting further the language of Judge Longyear, "the master of the vessel stood there with all the circumstances before him, and no doubt used his best judgment and acted accordingly. And although it may be now apparent that if he had given the order he did give, a little sooner, a collision might have been avoided, yet in view of the doubts with which the matter was necessarily surrounded at the time, I cannot say it was his duty so to have given the order," and that the Aetna is responsible because the order was not sooner given. The H. P. Baldwin, supra. I consider the Gifford as then in a position where she was to be regarded as a vessel in motion, with the duty resting upon her to give way to the Aetna, and so bringing the case within the principle of the decision, "holding, that where a vessel commits an error under impending danger, or in extremis, produced or brought about by another vessel, such error cannot be alleged as a fault by such other vessel."

The positive testimony of the men on the Aetna, that she was going about, head to wind, when the collision became imminent, is fortified by the fact that the jib-boom of the Gifford struck her foresail and then carried away the main rigging, and that the first blow was not forward of the foresail.

The case of The Charlotte Raab [Case No. 2,622], has been cited by claimants' counsel. But there, both vessels were on the starboard tack, close hauled. The Wall properly went in stays to avoid ice on her lee bow. As to the Raab, the vessel proceeded against, the case was not within rule 17, and the situation was fully comprehended by her master, who chose to push his vessel on, without giving the Wall time to get away on her port tack.

Decree for libellants.